UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

STEVEN J. SPIEGEL, derivatively on behalf
of TOPICAL BIOMEDICS, INC., and
individually as a shareholder of TOPICAL
BIOMEDICS, INC. and on behalf of all
shareholders similarly situated,

**VERIFIED COMPLAINT**
For Derivative Action under
Fed. R. Civ. Proc. 23.1

*Plaintiff,*

Index No: _____

*- against –*

Assigned Judge:

LOUIS PARADISE (a/k/a LOU PARADISE)
and TOPICAL BIOMEDICS, INC.,
a Delaware corporation, as Nominal Defendant,

*Defendant.*
------------------------------------------------------------- X

Steven J. Spiegel is currently a shareholder and director in Topical BioMedics,

Inc., a Delaware corporation (the "Company"), and files this Verified Complaint (the

"Complaint"), as a shareholder on behalf of the Company as plaintiff ("Plaintiff")

derivatively pursuant to Federal Rules of Civil Procedure ("FRCP") Rule 23.1, with

individual shareholder claims in the alternative, against Louis Paradise ("Defendant"), a

founder of the Company, who is also currently a director, shareholder, and the President

and Chief Executive Officer of the Company, seeking to remedy Defendant's violations

of the law including: (i) failure and refusal to call shareholder meetings; (ii) failure and

refusal to call board of director meetings; (iii) failure and refusal to allow nominations

and elections to fill three vacant board of director positions (of seven total); (iv) failure

and refusal to provide basic books, records, shareholder lists, and corporate

documentation to shareholders and directors of the corporation, or allow inspection of

the same; (v) failure and refusal to allow a board of directors to manage and direct the

1

business affairs of the Company; (vi) failure and refusal to account for the Company's financial information and performance; (vi) breach of the Shareholders' Agreement dated as of January 1998; and (vii) breach of fiduciary duties towards the Company, its shareholders and directors, all of which have caused substantial financial losses to the Company and other damages, including but not limited to lost business opportunities and damage to the Company's reputation and goodwill; or, alternatively to the foregoing derivative claims, for monetary damages as a result of Defendant's securities fraud.

Plaintiff hereby alleges upon personal knowledge as to his own acts, upon information and belief as to all other matters, as follows:

## PRELIMINARY FACTUAL INFORMATION:
## THE COMPANY, ITS FOUNDERS, SHAREHOLDERS, AND DIRECTORS

1.       This is an action for "corporate therapeutics" seeking certain equitable and injunctive relief and monetary damages, based upon the failure and refusal of Defendant Louis Paradise, who remains in *de facto* control of nominal Defendant the Company, to manage and operate the Company in accordance with the corporate governance requirements and standards of Delaware General Corporation Law and the organizational and governance documents of the Company itself, including without limitation its shareholders' agreement.

2.       The Company is organized as a general corporation (C-type), existing under the business corporation laws of the State of Delaware, with its headquarters and operations in the State of New York at 6565 Springbrook Avenue, Rhinebeck, New York 12572 (Dutchess County). The Company sells topical homeopathic "pain cream" medicines, some patented or formulated for specific disease treatment like fibromyalgia, under the brand name "Topricin®" (and most recently, without any review, oversight, or

approval by the Board of Directors, under the brand name "My Pain Away[TM]"). These pain cream products are sold through certain pharmacies, drug stores, grocery stores, natural food and specialty retailers, catalogues, and direct-to-consumer media (including by Defendant Louis Paradise himself as a radio host and pitchman). Sales are believed to be approximately five or six million dollars per year, but these figures are uncertain, as Defendant Louis Paradise (or persons reporting to him) have allowed plaintiff very limited or restricted access to financial reports of the Company[1].

3.      Defendant Louis Paradise (a/k/a Lou Paradise) is an individual residing in Dutchess County, State of New York. He formulated the first of the Company's topical homeopathic pain cream products for his own medical use, to obtain pain relief and healing for his own severe bilateral carpal tunnel syndrome. On or about 1993, newly divorced from his first wife, Mr. Paradise began to sell his pain cream product to the public originally under the brand name "TPR Cream (The Perfect Remedy / Therapeutic Pain Rub)." The Company was formed by Defendant on November 9, 1994 as "TPR International Ltd, Inc." (before being renamed "Topical BioMedics, Inc." as part of an "ethical" rebranding of the Company and its pain cream products described in ¶7 of this Verified Complaint, *infra*).

4.      To finance the early sales of TPR Cream (and the Company as the product's sales organization), Mr. Paradise sold shares of stock in affiliated companies and then shares of non-common shares in the Company itself. He began to sell these

---

[1] Even in his capacity as director, plaintiff has yet to see 2015 year-end financials to ascertain the most recent annual sales figures, despite year-end financials being requested in writing by plaintiff (and despite best and customary practices to provide board directors in a corporation with such year-end financial reporting). Further, financial information when presented by Defendant is not based on independent review or auditing, and Defendant Louis Paradise (or persons reporting to him) have not allowed plaintiff access to the Company's accountants or other sources of independent verification.

securities to family and friends, then extended sales of equity interests to acquaintances and others in the general public across multiple States. Sometime on or about 1993, Mr. Paradise took on two other newly-divorced "partners" whom he named "co-founders" of the Company—Aurora Cividanes and Stephen Duricko—and to whom he later gave common shares in the Company (i.e., not shares in affiliated entities or non-common stock in the Company, as Mr. Paradise had sold to other investors) in exchange for Ms. Cividanes' and Mr. Duricko's full-time commitments and services to the Company. Hard-pressed for cash, to continue financing the Company, Defendant Louis Paradise also began selling royalty interests on sales of the pain cream product through related companies and affiliates. Many people seemed interested in investment (and involvement) based on the perceived efficacy of the topical product, with growing testimonials of it being a "miracle" cream for trauma care, neuropathic pain relief, and soft tissue healing.

5.      By 1996, with just a few hundred thousand dollars in gross annual revenue before expenses, but with approximately two hundred shareholders (as well as non-shareholders with royalty interests), Defendant Louis Paradise realized that the Company's further growth, profitability, and future capital-raising depended on re-working the Company's corporate/capital structure. By 1996, it was becoming increasingly difficult for Defendant Louis Paradise to raise money to keep the Company afloat; not only was the Company losing hundreds of thousands of dollars per year—its expenses far exceeding its revenues despite the heart-warming testimonials for the product's efficacy—but the Company itself was beset with shareholder squabbles and was financially challenged by the weight of royalty payments that were being

dishonored. Accordingly, Defendant Louis Paradise sought out corporate legal counsel for the Company, interviewing numerous lawyers for the job, ultimately selecting McGovern & Associates, P.C., a prominent boutique law firm based in Greenwich, Connecticut, which according to their website has "a long and successful track record of assisting both high-tech and non-tech companies in getting started and funded, in addition to leveraging [the law firm's] global contacts to facilitate and realize the growth and exit strategies of the companies [they] represent."[2]

6.     Soon after engaging this law firm, there were misunderstandings and mistrust between McGovern & Associates, P.C. and Defendant Louis Paradise, specifically with respect to Mr. Paradise's expectations for legally restructuring the royalty arrangements, non-common stock shareholdings, and shareholders in related affiliates, so Defendant Louis Paradise re-approached corporate counsel whom he had previously interviewed, including plaintiff Steven J. Spiegel, Esq.  Mr. Spiegel had recently left the corporate law firm of Skadden Arps Slate Meagher & Flom, LLP, in New York City and established an office in Goshen, New York, to be closer to his then young family and home in Orange County, New York, and he already had several significant clients in the "health and wellness" industry. An engagement letter was negotiated and signed between the Company and Mr. Spiegel's law firm, which provided for legal services at a discounted hourly rate, and Mr. Spiegel proceeded to rework the corporate structure, eliminating the royalty arrangements, and convincing the royalty interest holders, shareholders in related affiliates, and non-common stock shareholders in the Company alike to all swap their equity interests, as part of a tax-free exchange

---

[2] According to the website for McGovern Capital LLC (linked to the website for McGovern & Associates, P.C.), these client companies included Sobe Beverages, which it says was later sold to PepsiCo for $370 Million Dollars.

under Internal Revenue Code Section 368, all in exchange for common stock in the Company, along with its founders (who previously held all the Company's common stock). The Shareholders' Agreement for the Company dated as of January 7, 1998 (the "Shareholders' Agreement"), reciting this restructuring/reorganization plan in its recitals, was the product of much negotiation and redrafting based on the comments, concerns and objections of several of Defendant's investors initially unwilling to swap their interests for common stock in the Company. Plaintiff believes that all shareholders of the Company[3] have executed and delivered this Shareholders' Agreement, annexed hereto as Exhibit "A".

     7.      Thereafter, plaintiff Mr. Spiegel began diligently working on a wide variety of other legal and business matters for the Company. Among many other things, he introduced the Company to various entrepreneurial and marketing professionals, who assisted Defendant in rebranding[4] and remarketing the Company as a safe and effective "ethical drug" in compliance with all then-current medical protocols and FDA regulations, and in renaming, repackaging, and trademarking[5] the product as "Topricin". One of the goals of this rebranding and compliance effort was to facilitate Topricin's distribution and sale by chain pharmacies and other larger national and regional retailers, as well as by physicians and healthcare professionals themselves, who demanded proof

---

[3] Including shareholders who acquired their shares of common stock in the Company after January 7, 1998 and were therefore not part of the original restructuring/reorganization transaction, who were required to execute the Shareholders' Agreement as a condition of stock ownership nonetheless.

[4] For instance, the logo and new packaging design for "Topricin" (with its distinctive "T" blue on blue color arrangement) was done by a senior creative professional at Saatchi & Saatchi, introduced to the Company by Mr. Spiegel, who later received common stock in the Company as payment for her design services.

[5] Mr. Spiegel later successfully defended the trademark before the Trademark Trial and Appeal Board (within the United States Patent and Trademark Office) when contested by the Pharmacia division of the pharmaceutical giant Pfizer.

of regulatory compliance and proof of medical safety and efficacy. In addition to championing this "ethical" model for the Company's homeopathic pain cream product, Mr. Spiegel also developed a strategy to patent the product, despite Defendant Louis Paradise's own belief that homeopathic medicines could not be patented.[6]  Although plaintiff Steven J. Spiegel, Esq., was not paid for any of his work per the terms of his engagement letter with the Company[7], he continued to provide ongoing services based on his belief in the Company's promising future (and based on the product's remarkable pain relief efficacy for his own mother Lynda's chronic debilitating pain from a back injury, and his grandfather Moe's nighttime foot neuropathy[8]). Moreover, when requested by the Company to help finance inventory or special projects, Mr. Spiegel made additional cash investments in exchange for additional common stock equity in the Company and provided loans to the Company.[9]

---

[6] Mr. Paradise seemed interested in learning more about patent law, so Mr. Spiegel bought Mr. Paradise a good layman's book on patents (then offered through Nolo Press), and then Mr. Spiegel reviewed with Mr. Paradise some of the chapters about how synergistic combinations of elements can be patentable, explaining to Mr. Paradise how that concept could be applied to homeopathy and Topricin (even though homeopathic medicines were generally not thought patentable because they were traditionally administered in single element doses). This strategy was then utilized by a patent lawyer engaged by the Company to successfully obtain a patent for Topricin[®].

[7] In lieu of the cash payments (based on an hourly rate) originally owed for his services per the engagement letter, plaintiff Steven J. Spiegel received common stock equity in the Company. He received 175,000 shares on the finalization of the restructuring transaction and Shareholders' Agreement on January 7, 2008, purchased an additional 10,000 shares for cash on October 17, 2000, and received 410,000 more shares on April 10, 2002.

[8] Moe Roth, then in his 80s and who lived to 96, was so impressed with Topricin for easing his neuropathic foot pain and helping him sleep at night that he became a "representative" of the Company in Broward County, Florida, where he resided. Mr. Roth frequently purchased Topricin at his expense (whether for his own use, to share with friends, or to resell), always speaking to Steve Duricko to take his reorder. Mr. Roth and Mr. Duricko soon regarded each other as friends, and their enjoyable conversations together were often recounted by both men to plaintiff.

[9] As Mr. Paradise wrote to Mr. Spiegel on December 13, 2000: "The immense amount of help, resolve and class you provide our fledging company to gain momentum and strength is extraordinary. There has never been a time that you haven't given your best and then some. No matter what has been asked of you, you have cheerfully executed your wonderful talent and experience, matched only by your enthusiastic warmth, zeal and friendship. We all are better off as a result."

8.      Following a dispute between Plaintiff Steven Spiegel and Defendant Louis Paradise in the early 2000s, in which it became obvious to Mr. Spiegel that the interests of management and the interests of the Company were not aligned and often conflicted (which made Mr. Spiegel's further legal representation of the Company's interests, as opposed to Mr. Paradise's own management interests, difficult), Mr. Spiegel resigned as the Company's corporate counsel. Defendant Louis Paradise replaced Mr. Spiegel as the Company's corporate counsel with Stephen Diamond, Esq., of Poughkeepsie, New York, and Mr. Diamond subsequently arranged for the repayment to Mr. Spiegel of certain past due loans[10] made by Mr. Spiegel to the Company, and facilitated the reformation of the board of directors of the Company.

9.      As part of the resolution by corporate counsel Mr. Diamond of this dispute between Mr. Spiegel and Mr. Paradise, and in connection with a long-overdue formal shareholders' meeting which Mr. Spiegel had been pressuring Mr. Paradise (and now Mr. Diamond) to hold, the board of directors was formally expanded from five (5) directors to seven (7), who were as follows: (1) Defendant Louis Paradise; (2) co-founder Aurora Cividanes (who had by then married Mr. Paradise and went by the married name of Aurora Paradise); (3) co-founder Stephen Duricko (now deceased, but whose stock interest putatively passed to his only issue, daughter Jennifer Duricko Erdogan); (4) Plaintiff Steven Spiegel; (5) John Stanton, an independent pharmacist and entrepreneur who had invested more than $300,000 in the Company, and who encouraged more than a dozen other friends and family to also invest in the Company; (6) Rob Hanson, a direct marketing professional with close affiliations with television

---

[10] A promissory note dated May 30, 2002 from Mr. Spiegel to the Company in the original principal amount of $23,500, which was due in full on September 1, 2004, had gone unpaid and unaddressed by the Company.

channel QVC, who had invested in the Company, along with many of his family
members and friends whom he similarly encouraged to invest; and (7) Michael Duricko,
a senior commercial banking executive in northeastern Pennsylvania, who had also
made a small investment in the Company and was a cousin of co-founder (and fellow
board director) Stephen Duricko.

10.     For a while thereafter, Defendant Louis Paradise seemed to acknowledge
the proper legal role of a board of directors in corporate governance, but even during this
period of a "semi-functioning" board of directors in the mid 2000s, Mr. Paradise
continued to unilaterally set the board agendas, unilaterally call the board meetings,
unilaterally decide whether or when to take any board actions, and unilaterally make all
or most strategic and major financial decisions without input, review, oversight, consent,
voting, management or direction by the board of directors. The board meetings and
notices to the board of directors were essentially marketing pitches to the directors that
glowingly described business opportunities available to the Company, with self-serving
praise for the company's officers and management including Defendant Louis Paradise.

11.     By 2006, Mr. Michael Duricko resigned as a director, apparently
frustrated by the manner in which Defendant Louis Paradise was operating the
Company. Among other things, Michael Duricko expressed disappointment (A) how
Mr. Paradise ignored Mr. Duricko's requests for corporate books and records (e.g., "Lou,
is it possible to get each Board member a list of our current stockholders and the number
of shares they own just to put this into proper perspective?" Mr. Duricko wrote on
March 29, 2006, but his request was ignored by Mr. Paradise); (B) how Mr. Paradise
promised to follow up on Mr. Duricko's request for director's and officer's insurance

coverage for the board, but again never did (e.g., Mr. Duricko's queried on April 7, 2006 "Any idea as to the extent of Management and Director's liability in the case of a default? Is there an insurance policy in place [much like E&O] that would protect all of us in the event of a class action?" to which Mr. Paradise responded on April 7, 2006, "As to errors and omissions insurance we are looking at some products for this purpose"); and (C) how Mr. Paradise disingenuously claimed to desire board of director input yet was unwilling to alter his unilateral, unyielding approach to decision-making (e.g., Mr. Duricko wrote on April 21, 2006 "Lou, Please define, 'I would prefer to hear any initial thoughts you may have on Crossfire contract, as opposed to commenting at this time'... [I] need to know how to relay my thoughts without commenting...", and with Mr. Duricko resigning as a director shortly after this sarcastic email to Mr. Paradise). In any event, Michael Duricko's abrupt resignation left the first of several long-term vacancies on the board of directors.

12.     After Mr. Duricko's resignation, the manner in which Defendant Louis Paradise was managing and operating the Company, without regard to actual governance by its board of directors, was the subject of numerous director conversations, and eventually prompted the resignation of Mr. Rob Hanson in 2011.

13.     For instance, at the start of 2010, the Company began to focus its business efforts (at considerable expense) on a newsletter entitled *"Natural Healing, Natural Wellness"* again without any notice, input, review, oversight, or consent by the board of directors. Plaintiff Mr. Spiegel wrote by email to Defendant Mr. Paradise on January 7, 2010, with questions about this newsletter and its role in the Company's strategic plans: